**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS | ) | |
| IN WASHINGTON, | ) | |
| | ) | |
| Plaintiff, | ) | CV-08-0576 (ESH) |
| | ) | |
| vs. | ) | |
| | ) | |
| MICHAEL LEAVITT, SECRETARY, DEPARTMENT | ) | |
| OF HEALTH AND HUMAN SERVICES, and | ) | |
| | ) | |
| DEPARTMENT OF HEALTH AND HUMAN | ) | |
| SERVICES, | ) | |
| | ) | |
| Defendants. | ) | |

_____)

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendants Michael Leavitt, Secretary, Department  Health and Human Services, and the

Department of Health and Human Services, by and through counsel, respectfully move for

summary judgment pursuant to Federal Rule of Civil Procedure 56.  As set forth in the

accompanying Memorandum, and Statement of Material Facts as to Which There Is No Genuine

Issue, there is no genuine issue of fact as to the non-applicability of the Federal Advisory

Committee Act to the March 2008 meetings Defendants held regarding the Office of Head Start's

performance standards.

In support of this motion, Defendants rely upon the supporting memorandum, as well as a

Statement of Material Facts as to Which There Is No Genuine Issue.  A proposed order is also

attached.

Dated: July 1, 2008

AMY WEISER
Office of the General Counsel
Department of Health and
  Human Services

Respectfully submitted,

GREGORY G. KATSAS
Acting Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

ELIZABETH J. SHAPIRO
Assistant Branch Director
Federal Programs Branch


\s\ *Diane Kelleher*
DIANE KELLEHER
Senior Counsel
United States Department of Justice
Civil Division, Rm. 7318
20 Massachusetts Ave, NW
Washington, D.C.  20530
Telephone:      (202) 514-4775
Fax:            (202) 616-8470
E-mail:         Diane.Kelleher@usdoj.gov

*Counsel for Defendants*

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

_____
                                                    )
CITIZENS FOR RESPONSIBILITY AND ETHICS              )
IN WASHINGTON,                                       )
                                                    )
                              Plaintiff,             )        CV-08-0576 (ESH)
                                                    )
                vs.                                  )
                                                    )
MICHAEL LEAVITT, SECRETARY, DEPARTMENT              )
  OF HEALTH AND HUMAN SERVICES, and                 )
                                                    )
DEPARTMENT OF HEALTH AND HUMAN                       )
  SERVICES,                                          )
                                                    )
                              Defendants.            )
_____)

**MEMORANDUM IN SUPPORT OF**
**DEFENDANTS MOTION FOR SUMMARY JUDGMENT**

DIANE KELLEHER
Senior Counsel
Federal Programs Branch
United States Department of Justice

*Counsel for Defendants*

## TABLE OF CONTENTS

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FACTUAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    I.     The Head Start Program.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    II.    The March 2008 Performance Standards Meetings.. . . . . . . . . . . . . . . . . . . . . 3

    III.   This Litigation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

LEGAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    I.     The Federal Advisory Committee Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    II.    Summary Judgment Standard. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    FACA DOES NOT APPLY TO THE MARCH 2008 PERFORMANCE
    STANDARDS MEETINGS BECAUSE THE PARTICIPANTS ACTED AS
    INDIVIDUALS, SHARED ONLY THEIR INDIVIDUAL OPINIONS,
    TOOK NO ACTION AS A GROUP, AND THUS DID NOT FUNCTION
    AS A COMMITTEE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

## **TABLE OF AUTHORITIES**

**CASES**                                                              **PAGE(S)**

American Soc. of Dermatology v. Shalala,
   962 F. Supp. 141 (D.D.C. 1996). ........................................................................... 14

Anderson v. Liberty Lobby, Inc.,
   477 U.S. 242 (1986). ..................................................................................... 10, 11

Association of American Physicians and Surgeons, Inc. v. Clinton,
   997 F.2d 898 (D.C. Cir. 1993). ................................................................. passim

Byrd v. EPA,
   174 F.3d 239, 245 (D.C. Cir. 1999) . ...................................................................... 9

Celotex Corp. v. Catrett,
   477 U.S. 317 (1986). ..................................................................................... 9, 10

Founding Church of Scientology v. National Security Agency,
   610 F.2d 824 (D.C. Cir. 1979). ............................................................................. 10

Grigsby Brandford & Co., Inc. v. U.S.,
   869 F. Supp. 984 (D.D.C. 1994). ......................................................................... 14

Huron Envt'l Activist League v. EPA,
   917 F. Supp. 34 (D.D.C. 1996). ..................................................................... 14, 15

Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
   475 U.S. 574 (1986). ........................................................................................... 11

Natural Resources Defense Council v. EPA,
   806 F. Supp. 275 (D.D.C. 1992). ......................................................................... 15

Natural Resources Defense Council  v. Herrington,
   637 F. Supp. 116 (D.D.C. 1986). .................................................................... 14, 15

Public Citizen v. U.S. Dep't of Justice,
   491 U.S. 440 (1989). ............................................................................................. 9

Washington Toxics Coalition v. EPA,
   357 F. Supp. 2d 1266 (W.D. Wash. 2004)........................................................... 15

## **STATUTES**

FACA, 5 U.S.C. App.. ................................................................................ passim

5 U.S.C. § 3. ........................................................................................................ 9

5 U.S.C. § 552b. .................................................................................................. 9

42 U.S.C. § 9836a. .......................................................................... passim

5 U.S.C. § 552. ............................................................................................... 9, 10

## **FEDERAL RULES**

Fed. R. Civ. P. 56(c). .................................................................... passim

## **LEGISLATIVE MATERIALS**

H.R. Rep. No. 1017, 92d Cong., 2d Sess. (1972). ................................ 15, 16

118 Cong. Rec. 30,272 (1972). .......................................................... 16

118 Cong. Rec. 30,276 (1972). .......................................................... 16

118 Cong. Rec. 16,299 (1972) . ......................................................... 16

118 Cong. Rec. 30,280 (1972). .......................................................... 16

**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, | ) ) ) | |
| Plaintiff, | ) ) | CV-08-0576 (ESH) |
| vs. | ) ) | |
| MICHAEL LEAVITT, SECRETARY, DEPARTMENT OF HEALTH AND HUMAN SERVICES, and | ) ) ) | |
| DEPARTMENT OF HEALTH AND HUMAN SERVICES, | ) ) ) | |
| Defendants. | ) ) | |

_____

## <u>INTRODUCTION</u>

Confusing theoretical possibility with legal sufficiency, Plaintiff's suit is based on the dubious and thoroughly discredited assertion that every meeting between private citizens and executive branch employees automatically triggers the Federal Advisory Committee Act ("FACA"). There is no presumption of FACA's applicability to every such meeting, and as the Office of Head Start communicated to Plaintiff before this suit was filed, the meetings at issue in this litigation were not subject to FACA because they merely represented an opportunity for experts in various subject-matters to give their individual opinions to government staff. The experts who attended these meetings did not take any action as a group; they did not vote, they did not reach consensus, and they did not prepare a report. This unstructured and informal arrangement – which permitted the experts to share individuals opinions and was specifically required by Congress – does not amount to action by a group and was not a committee. Accordingly, FACA does not apply, and summary judgment should be granted for Defendants.

## FACTUAL BACKGROUND

### I.    The Head Start Program

The Head Start program promotes school readiness of low-income children by enhancing their cognitive, social and emotional development through the provision of educational, health, nutritional, social and other services to enrolled children and families.  See Statement of Material Facts as to Which There Is No Genuine Issue ("St. of Mat. Facts"), filed herewith, ¶ 6.  Head Start programs engage parents in their children's learning and help them in making progress toward their educational, literacy and employment goals.  Id.

The Department of Health and Human Services administers the Head Start program by funding and exercising oversight stewardship of the approximately 1,600 local community organizations that provide Head Start services to low-income children and families in their community.  Id. at ¶ 7.  All Head Start programs are responsible for serving a specified community or communities.  Id.  They must identify all eligible families in their community and, subject to the limitations of their annual funding grant, serve as many children and families as possible, giving priority to those most in need of a Head Start experience.  Id.  Currently, at least 90% of all enrolled children must be from families with incomes below the poverty line or families receiving public assistance (although the recent law reauthorizing Head Start requires regulations to be adopted that will, in certain circumstances, allow programs to serve up to 35% of their enrollment from families with incomes between 100%-130% of poverty).  Id.

II.    **The March 2008 Performance Standards Meetings**

The plaintiff's lawsuit relates to two meetings that were organized by the Office of Head Start within the Department of Health and Human Services ("OHS").  Id. at ¶ 8.  These meetings occurred in March 2008; the first meeting occurred on March 4-5, 2008, and the second meeting took place on March 25-26, 2008.  Id.  Both were held at the Hotel Palomar in Arlington, VA. Id.  Attendees at the meetings included OHS staff and experts from various fields.  Id.  These fields included early childhood education, child health care, family services (including linguistically and culturally appropriate services to non-English speaking children and their families), administration, and financial management, and experience in the operation of Head Start programs.  Id.  Experts attending the March 25-26, 2008 meeting were also experienced in these areas and their applications to tribal areas.  Id.[1]

The purpose of these meetings was for Head Start staff to fulfill a statutory obligation to consult with subject-matter experts in these fields prior to proposing modifications to Head Start's performance standards for its agencies and grantees.  Id. at ¶ 9.  Congress provided for this consultation in a recently enacted statute, the Head Start for School Readiness Act of 2007, which was signed by the President on December 12, 2007.  Id.

---

[1]  The meetings will be referred to herein as "the March 2008 performance standard meetings."

The obligation is set forth in 42 U.S.C. § 9836A(a)(2), which provides that,

> In developing any modifications to standards required under paragraph
>
> > (1), the Secretary shall-
> >
> > > consult with experts in the fields of child development, early childhood education, child health care, family services (including linguistically and culturally appropriate services to non-English speaking children and their families), administration, and financial management, and with persons with experience in the operation of Head Start programs . . .

OHS organized the March 2008 meetings to fulfill its statutory obligation to consult with experts prior to proposing changes to its "program performance standards by regulation applicable to Head Start agencies and programs." 42 U.S.C. § 9836(A)(a)(1); see also St. of Mat. Facts, ¶¶ 10-11. The last time these performance standards were revised was in 1993-94. Id. at ¶ 11.

OHS invited a number of experts - approximately 50 - to attend the March 2008 performance standard meetings. Id. at ¶ 12. OHS officials informed the experts attended the meetings that they were there to "help inform the Federal staff of the 'state of the art' in areas relevant to Head Start." See id. at 12. Some of the questions OHS staff wanted to discuss (id.) included:

> What are the most significant advances in your field?
>
> What do you consider to be the best practices in your field?
>
> If you were developing or amending standards in your field, what would they look like?

Where has Head Start excelled in delivering services to children and families and where we could do better?

How can the current standards be improved to allow for more clarity, to improve collaboration, and to best support services to children and families?

OHS selected the experts to invite through a process that involved researching and finding experts in the statutorily-mandated fields (early childhood education, child health care, family services (including linguistically and culturally appropriate services to non-English speaking children and their families), administration, and financial management, and with persons with experience in the operation of Head Start programs), and then contacting those experts to determine if they were available for, and interested in, the March 2008 performance standard meetings. Id. at ¶ 13.

For experts attending the March 2008 performance standard meetings, OHS agreed to pay for their travel costs (if they resided more than 50 miles outside of downtown Washington D.C.), their hotel stay, a per diem for meals, and an honorarium of $200 per day for participating in the conference. Id. at ¶ 14.

The attendees for the March 2008 performance standards meetings did not have an organized structure or fixed membership. Id. at ¶ 15. There was no attempt to achieve consensus among those attending; the discussions were loose and unstructured. Id. They convened only to offer their own opinions regarding their individual areas of expertise. Id.

The agendas for the meetings provided for both large group and small group discussions. See id. at ¶ 16. During these discussions, the experts shared their personal views on questions regarding appropriate quality and outcome measures in areas of education, health services, nutrition and assessment; the attendant costs to grantees of imposing rigorous standards; and

whether standards should be tied to what is customary and usual in state licensing, health and other requirements.  Id.  Other than the agenda, which set forth the meeting schedule, the March 2008 performance standards meetings had no structure or organization and represent the only occasion on which these two groups of experts were ever convened.  Id.

The experts were also attending the meeting in their personal capacities and were not asked to convey the views of their various organizations.  Id. at ¶ 17.  The experts did not take any positions as a group, and they did not provide any recommendations to the OHS staff who attended the meeting.  Id.

OHS staff attending the March 2008 performance standard meetings listened to what the experts had to say; no documents were generated as a result of the meeting (other than notes).  Id. at ¶ 18.  The input provided by the experts attending the March 2008 performance standards meetings was provided only on an individual basis.  Id.

OHS has not followed-up or contacted these experts since the March 2008 performance standards meetings concluded.  Id. at ¶ 19.

OHS is currently working on proposed modifications to performance standards for agencies and grantees.  Id. at ¶ 20.   These modifications will eventually be published as a notice of proposed rulemaking in the Federal Register.  Id.  Interested persons and organizations – including Plaintiff – will be given the opportunity to comment on any proposed changes to the Head Start performance standards before any changes are finalized.  Id.

The groups who attended the March 2008 performance standards meetings are not the same as the formal advisory committee on Re-Designation of Head Start Grantees convened by Secretary Leavitt and chartered on January 8, 2008.  Id. at ¶ 21.  That committee is a formal advisory committee and is subject to all the provisions of FACA.  Id.

## II.    This Litigation

As detailed in the Complaint, Plaintiff sent a letter to Director Brown on February 28, 2008; in that letter, Plaintiff indicated that it had learned – through unspecified means – that Head Start planned to seek "the advice and recommendations of a group of private individuals concerning a massive revision of the Head Start performance standards."  Compl., ¶ 17.  As such, Plaintiff contended that the meeting was subject to FACA.  In response, Director Brown sent a letter dated February 28, 2008, stating that the meeting about which Plaintiff had inquired was not subject to FACA "because the purpose of the meeting is for individuals to voice their individual opinions rather than to consult with the group."  Compl., Ex. B.  Plaintiff sent a follow-up letter to Director Brown on March 4, 2008, in which they noted that Secretary Leavitt had recently announced the nomination of eight individuals to the Advisory Committee on Re-Designation of Head Start Grantees; Plaintiff asked if this Advisory Committee was the same was the group referenced in its February 28, 2008 letter.  Id. at ¶ 20, Ex. D.  Director Brown replied to Plaintiff by letter dated March 7, 2008, stating that the Advisory Committee was not the "same group that you referenced in your February 28, 2008 letter."  Id. at Ex. E.  As noted by Director Brown, the Advisory Committee on Re-Designation of Head Start Grantees is subject to FACA.  Id.

Plaintiffs filed the instant lawsuit approximately a month later, on April 3, 2008. Defendants attempted to see if the Plaintiff's claims could be resolved short of motion practice, but the parties were not able to agree on a process through which information could be provided; Defendants asked for an exhaustive list of information sought by Plaintiff, to avoid "a process by which the agency provides . . . additional information about the early March 2008 meeting, only to be told that the information provided is insufficient." See June 5, 2008 e-mail from Diane Kelleher to Scott Hodes (attached as Exhibit 1). Plaintiff indicated it could not provide such a list, since the agency had "not provided any substantial information about the meeting and activities of the subject group despite repeated requests from CREW for that information." See June 6, 2008 Letter from Scott Hodes to Diane Kelleher (attached as Exhibit 2).

## LEGAL BACKGROUND

### I.    The Federal Advisory Committee Act

Congress enacted FACA in 1972 to reduce the mushrooming cost of unnecessary blue ribbon commissions, advisory panels, and honorary boards set up by the government to advise the President and federal agencies. The statute seeks to eliminate committees that have outgrown their usefulness and impose uniform procedures on those that are indispensable. See 5 U.S.C. App. 2 § 2(b). FACA defines an "advisory committee" as "any committee, board, commission, council, conference, panel, task force, or other similar group, or any subcommittee or other subgroup thereof" that is "established" by statute, or "established or utilized" by the President or by one or more agency, "in the interest of obtaining advice or recommendations for the President or one or more agencies or officers of the Federal Government." Id. at § 3(2).

-8-

Accordingly, in order for FACA to apply, an "advisory committee" must be "established or utilized by one or more agencies, in the interest of obtaining advice or recommendations for . . . one or more agencies or officers of the Federal Government, . . ." within the meaning of FACA. 5 U.S.C. § 3(2)(C). See generally Public Citizen v. U.S. Dep't of Justice, 491 U.S. 440, 452 (1989). "[T]o prevent FACA from sweeping more broadly than Congress intended," these terms are read narrowly. Byrd v. EPA, 174 F.3d 239, 245 (D.C. Cir. 1999) (citing Pub. Citizen, 491 U.S. at 452). Accordingly, an advisory committee is not "established" by an agency unless it is "actually formed by the agency." Byrd, 174 F.3d at 245.

FACA imposes an array of procedural requirements on the creation and operation of "advisory committees." An "advisory committee" cannot meet or take any action until a detailed charter is filed with the head of the agency to which it reports and with the House and Senate committees having legislative jurisdiction over the agency. Id. at § 9(c).[2] Every "advisory committee" must give advance notice in the Federal Register of any meetings, id. at § 10(a)(2), hold all meetings open to the public in accordance with the Government in the Sunshine Act, 5 U.S.C. § 552b(c), id. at §§ 10(a)(1) & (d), keep detailed minutes of each meeting and copies of all reports received, issued, or approved by the advisory committee, id. at § 10(c), make its records available to the public for inspection and copying at a single location in accordance with

---

[2] The charter must contain such information as "the committee's official designation," id. at § 9(c)(A), the period of time necessary for the committee to carry out its purposes," id. at § 9(c)(C), "a description of the duties for which the committee is responsible, and, if such duties are not solely advisory, a specification of the authority for such functions," id. at § 9(c)(F), "the estimated annual operating costs in dollars and man-years for such committee," id. at § 9(c)(G), "the estimated number and frequency of committee meetings," id. § 9(c)(H), and "the committee's termination date, if less than two years from the date of the committee's establishment." Id. at § 9(c)(I).

the Freedom of Information Act, 5 U.S.C. § 552, <u>id.</u> § at 10(b), be "fairly balanced in terms of the points of view represented and functions to be performed," <u>id.</u> at § 5(b)(2), and "not be inappropriately influenced by the appointing authority or by any special interest." <u>Id.</u> at § 5(b)(3).

## II.    Summary Judgment Standard

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The Supreme Court has interpreted this standard to mandate summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986).

To prevail on a motion for summary judgment the moving party must prove that no substantial and material facts are in dispute and that the movant is entitled to judgment as a matter of law.  <u>Founding Church of Scientology v. National Security Agency</u>, 610 F.2d 824, 836 (D.C. Cir. 1979); Fed. R. Civ. P. 56(c).  The moving party's burden is discharged by a showing "that there is an absence of evidence to support the nonmoving party's case." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986).  The nonmoving or responding parties' response is examined to determine whether, on admissible evidence, it would be sufficient to carry the burden of proof at trial.  <u>Celotex</u>, <u>supra</u> 477 U.S. at 322-325.  The standard test for summary judgment is "whether a fair minded jury could return a verdict for the [non movant] on the evidence presented."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252, (1986).

According to Rule 56(e), "[w]hen a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party."  Summary judgment is mandated where the non-moving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." Celotex, 477 U.S. at 323.

"The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252.  The non-movant must do more than simply show there is some "metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); see also Anderson, 477 U.S. at 249.  Accordingly, viewing the evidence in the light most favorable to the nonmoving party, the court should determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52.

## ARGUMENT

**FACA DOES NOT APPLY TO THE MARCH 2008 PERFORMANCE STANDARDS MEETINGS BECAUSE THE PARTICIPANTS ACTED AS INDIVIDUALS, SHARED ONLY THEIR INDIVIDUAL OPINIONS, TOOK NO ACTION AS A GROUP, AND THUS DID NOT FUNCTION AS A COMMITTEE.**

An advisory committee is defined by FACA as "any committee, board, commission, council, conference, panel, task force, or other similar group, or any subcommittee or other subgroup thereof . . . established or utilized by one or more agencies . . . in the interest of

-11-

obtaining advice or recommendations for . . . one or more agencies or officers of the Federal

Government."  FACA § 3(2).

The D.C. Circuit has explained that FACA's application depends entirely on the specific

context:

> When we examine a particular group or committee to determine whether FACA
> applies, we must bear in mind that a range of variations exist in terms of the
> purpose, structure, and personnel of the group.  Perhaps it is best characterized as
> a continuum.  At one end one can visualize a formal group of a limited number of
> private citizens who are brought together to give publicized advice as a group.
> That model would seem covered by the statute regardless of other fortuities such
> as whether the members are called 'consultants.'  At the other end of the
> continuum is an unstructured arrangement in which the government seeks advice
> from what is only a collection of individuals who do not significantly interact with
> each other.  That model, we think, does not trigger FACA.

Association of American Physicians and Surgeons, Inc. v. Clinton, 997 F.2d 898, 915 (D.C. Cir.

1993).

Accordingly, a meeting where a group of individuals does not act as a group, and takes no

action as a group, does not constitute action by a committee, and thus does not implicate FACA.

See id. at 913 ("The point, it seems to us, is that a group is a FACA advisory committee when it

is asked to render advice or recommendations, as a group, and not as a collection of

individuals.").  As detailed in the Statement of Material Facts Not in Dispute, and in the

Declaration of Patricia E. Brown, Acting Director of the Office of Head Start (which is attached

to the Statement of Material Facts Not In Dispute), OHS organized the March 2008 performance

standards meetings to fulfill a statutory obligation to consult with subject-matter experts in

specified fields prior to proposing modifications to Head Start's performance standards for its

agencies and grantees.  St. of Mat. Facts, ¶¶ 9-12.  Congress provided for this consultation in a

recently enacted statute, the Head Start for School Readiness Act of 2007, which was signed by

the President on December 12, 2007.  Id. at ¶¶ 9-10.

The obligation is set forth in 42 U.S.C. § 9836a(a)(2), which provides that,

In developing any modifications to standards required under paragraph (1), the
Secretary shall-

consult with experts in the fields of child development, early
childhood education, child health care, family services (including
linguistically and culturally appropriate services to non-English
speaking children and their families), administration, and financial
management, and with persons with experience in the operation of
Head Start programs . . . .

The last time these performance standards were revised was in 1993-94.  St. of Mat. Facts, ¶ 11.

The fifty or so experts who attended the March 2008 performance standards meetings were there

to "help inform the Federal staff of the 'state of the art' in areas relevant to Head Start."  St. of

Mat. Facts, ¶ 12.  Some of the questions Head Start staff wanted to discuss (id.) included:

What are the most significant advances in your field?

What do you consider to be the best practices in your field?

If you were developing or amending standards in your field, what would they look
like?

Where has Head Start excelled in delivering services to children and families and
where we could do better?

How can the current standards be improved to allow for more clarity, to improve
collaboration, and to best support services to children and families?

The participants in the March 2008 performance standards meetings did not function as a

committee within the meaning of FACA.  The attendees for the March 2008 performance

standards meetings did not have an organized structure or fixed membership.  Id. at ¶¶ 15-18.

-13-

The experts did not take any positions as a group, and they did not provide any recommendations to the OHS staff who attended the meeting.  Id.  There was no attempt to achieve consensus among those attending; the discussions were loose and unstructured.  Id.  They convened only to offer their own opinions regarding their individual areas of expertise.  Id.  They attended the meetings in their personal capacities and did not convey the views of their various organizations. Id.  OHS has not contacted or otherwise followed-up with these experts since the meetings concluded, and the March 2008 performance standards meetings represent the only occasions on which these groups convened.  Id. at ¶¶ 16, 19.

Accordingly, the March 2008 performance standards meetings are similar to other cases in which courts have found that FACA does not apply.  See Huron Envt'l Activist League v. EPA, 917 F. Supp. 34, 42 (D.D.C. 1996) (granting government's motion for summary judgment where record indicated that "industry group has neither a fixed membership . . . . the so-called 'industry group' amounts to little more than two private trade associations with no specific purpose other than to represent the broad interests of their members . . . . the 'industry group' simply does not have the requisite formality and structure of an advisory committee"); American Soc. of Dermatology v. Shalala, 962 F. Supp. 141, 148 (D.D.C. 1996) (FACA does not apply to HHS physician panels where there "is no fixed membership"; where panel membership changes every year; where "panels are convened only once for the sole purpose of reviewing comments"; and where there is "no attempt to achieve a consensus among the panelists"); Grigsby Brandford & Co., Inc. v. U.S., 869 F. Supp. 984, 1002 (D.D.C. 1994) (finding no FACA violation where meeting had "no structure or organization"; and  where meeting "represent[ed] the only occasion on which that group of individuals was convened"); Natural Resources Defense Council v.

-14-

Herrington, 637 F. Supp. 116, 119-20 (D.D.C. 1986) (finding FACA did not apply to group of experts who briefed the Secretary of Energy where experts functioned as individuals rather than a group; suggesting "conclaves for the edification of government officials on the basis of some relative quantum of indicia of formality" are likely not subject to FACA).

That OHS chose the experts and set the conference agenda does not transform an information-gathering session into a FACA committee. See Natural Resources Defense Council v. EPA, 806 F. Supp. 275, 278 (D.D.C. 1992) (fact that the agency proposes the establishment of a committee is not dispositive of whether FACA applies). Indeed, the D.C. Circuit has already "rejected the very claim that the plaintiffs are advancing here: that the FACA is triggered by an agency's mere use of a private group to obtain advice." Huron, 917 F. Supp. at 41. Nor is FACA implicated by the fact that OHS may have the opinions given by the experts at the March 2008 performance standards meetings in mind as it drafts any proposed modifications. See Washington Toxics Coalition v. EPA, 357 F. Supp. 2d 1266, 1274 (W.D. Wash. 2004) ("As long as a committee is not a federal advisory committee under the legal standard delineated in Public Citizen, the Court does not find anything in the statute to indicate that federal agencies may not consult with such committees regarding policy issues without subjecting those committees to FACA regulations.").

Moreover, none of FACA's animating concern are implicated by these meetings – no undue or pernicious influence was being exercised on OHS staff during these meetings.[3] The

_____

[3] As a 1972 House Report warned,

[o]ne of the great dangers in this unregulated use of advisory committees is that special interest groups may use their membership on such bodies to promote their private concerns. Testimony received at hearings before the Legal and Monetary

-15-

attendees were chosen for their expertise – not their connections to industry.  St. of Mat. Facts,

¶ 13.  The travel and expense reimbursements – as well as honoraria – were modest and in

keeping with OHS's goal simply to have the experts in the relevant subject-matters on hand and

available.[4]

  There is no danger of ongoing violations from this process since the groups will not

reconvene.  Id., at ¶ 19.  Various documents associated with the meeting – such as the

correspondence with meeting attendees and meeting agendas – are attached to the Brown

Declaration.  Id. at ¶¶ 12-21.  Finally, to the extent Plaintiff wishes to be heard on the issue of

modifying Head Start's performance standards, it will be able to comment on proposed

modifications when they published in the Federal Register.  Id. at ¶ 20.

---

Affairs Subcommittee pointed out the danger of allowing special interest groups
to exercise undue influence upon the Government through the dominance of
advisory committees which deal with matters in which they have vested interests.

H.R. Rep. No. 1017, 92d Cong., 2d Sess. (1972), U.S. Code Cong. & Admin. News 1972, pp.
3491, 3496.  A Senate staff report submitted for the record by Senator Percy states that,

[v]iewed in its worst light, the federal advisory committee can be a convenient
nesting place for special interests seeking to change and preserve a federal policy
for their own ends.  Such committees stacked with giants in their respective fields
can overwhelm a federal decision maker, or at least make him wary of upsetting
the status quo.

118 Cong. Rec. 30,276 (1972). See 118 Cong. Rec. 16,299 (1972) (remarks of Rep. Fascell); 118
Cong. Rec. 30,272 (1972) (remarks of Sen. Metcalf); 118 Cong. Rec. 30,280 (1972) (remarks of
Sen. Roth).

  [4]  For experts attending the March 2008 performance standard meetings, OHS agreed to
pay for their travel costs (if they resided more than 50 miles outside of downtown Washington
D.C.), their hotel stay, a per diem for meals, and an honorarium of $200 per day for participating
in the conference.  See St. of Mat. Facts, ¶ 14.

## <u>CONCLUSION</u>

Since the March 2008 performance standards meetings did not involve action by a group,

the meeting was not subject to FACA.  Summary judgment should be granted for Defendants.

Dated: July 1, 2008                           Respectfully submitted,

AMY WEISER                                    GREGORY G. KATSAS
Office of the General Counsel                 Acting Assistant Attorney General
Department of Health and
  Human Services                              JEFFREY A. TAYLOR
                                              United States Attorney

                                              ELIZABETH J. SHAPIRO
                                              Assistant Branch Director
                                              Federal Programs Branch



                                              *\s\ Diane Kelleher*
                                              DIANE KELLEHER
                                              Senior Counsel
                                              United States Department of Justice
                                              Civil Division, Rm. 7318
                                              20 Massachusetts Ave, NW
                                              Washington, D.C.  20530
                                              Telephone:    (202) 514-4775
                                              Fax:          (202) 616-8470
                                              E-mail:       Diane.Kelleher@usdoj.gov

                                              *Counsel for Defendants*

# EXHIBIT  1

## Kelleher, Diane (CIV)

| | |
|---|---|
| **From:** | Kelleher, Diane (CIV) |
| **Sent:** | Thursday, June 05, 2008 2:39 PM |
| **To:** | scotthodes@infoprivacylaw.com; infoprivacylaw@yahoo.com |
| **Subject:** | CREW Head Start FACA case |

Scott,

When we spoke last week regarding the extension I planned to request, you indicated that CREW had filed the lawsuit against the Secretary and HHS because it felt that it did not have enough information about the Head Start meeting in early March 2008 to be assured that the mtg was not one that would be subject to FACA. You cited the lack of information in the agency's correspondence with CREW as one of the main reasons the suit was filed. I asked whether CREW might be willing to withdraw its suit if the agency provided some additional details on the early March 2008 meeting. You said that CREW might be interested in such an arrangement.

I have discussed this option with the agency, and there is some interest in this approach. But I don't want to follow a process by which the agency provides you with additional information about the early March 2008 meeting, only to be told that the information provided is insufficient. So I think the only way this approach could work is if you supply me with an exhaustive list of the additional information you would like regarding the early March 2008 meeting that would address CREW's concerns and permit CREW to withdraw the complaint. As I indicated on the phone, I understand that the early March 2008 meeting was a one-time occurrence, so I think that is one relevant piece of information that has already been provided.

I would appreciate it if you could let me know if this approach is still one that CREW is interested in relatively soon, and if so, provide me with the list of information that CREW needs, by June 10, 2008.

Thank you,
Diane Kelleher

---

Diane Kelleher
Senior Counsel
Federal Programs Branch, DOJ
202-514-4775 (tel)
202-616-8470 (fax)

# EXHIBIT 2

SCOTT A. HODES, ATTORNEY AT LAW
POST OFFICE BOX 42002
WASHINGTON, DC 20015
WWW.INFOPRIVACYLAW.COM

MEMBER DC AND MD BARS

(301) 404-0502

INFOPRIVACYLAW@YAHOO.COM

June 6, 2008

Ms. Diane Kelleher
Senior Counsel
United States Department of Justice
Federal Programs Branch
P.O. Box 883
Washington, D.C.  20044

<u>RE:  CREW v. Leavitt, No. 08-576 (D.D.C.) (ESH)</u>

VIA E-Mail

Dear Diane:

This is in reply to your e-mail of June 5, 2008 which followed up our earlier conversation about why CREW filed this lawsuit.  In that earlier conversation, I advised you that CREW had previously agreed to dismiss lawsuits where it received the information that it was seeking through litigation and was open to that approach here.  Your e-mail in response stated that "the only way this approach could work is if you [CREW] supply me with an exhaustive list of the additional information you would like regarding the early March 2008 meeting that would address CREW's concerns and permit CREW to withdraw the complaint."

Unfortunately, CREW is unable to provide this information at this time as your client has not provided any substantial information about the meeting and activities of the subject group despite repeated requests from CREW for that information.  Indeed, CREW filed this lawsuit precisely because it could get no information otherwise from HHS.  Accordingly, it is now your client's obligation to tell us what the meeting was about, who attended, and why HHS does not believe the group was subject to the FACA.  If, and only if, CREW receives this information and then agrees with your client's position, would CREW consider withdrawing the lawsuit.

If you wish to discuss this further, feel free to contact me at your convenience.  Thank you for your attention to this matter.

Sincerely,

Scott A. Hodes

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

_____

|  |  |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, | ) ) ) |
| Plaintiff, | ) ) |  CV-08-0576 (ESH) |
| vs. | ) ) |
| MICHAEL LEAVITT, SECRETARY, DEPARTMENT OF HEALTH AND HUMAN SERVICES, and | ) ) ) |
| DEPARTMENT OF HEALTH AND HUMAN SERVICES, | ) ) ) |
| Defendants. | ) ) |

_____)

**<u>PROPOSED ORDER</u>**

For good cause shown, the Court hereby **GRANTS** the motion for summary judgment

filed on behalf of defendants Michael Leavitt, Secretary, Department  Health and Human

Services, and the Department of Health and Human Services.

Dated:                                    _____

                                         ELLEN S. HUVELLE
                                         UNITED STATES DISTRICT JUDGE

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, | ) ) ) | |
| Plaintiff, | ) ) | CV-08-0576 (ESH) |
| vs. | ) ) | |
| MICHAEL LEAVITT, SECRETARY, DEPARTMENT OF HEALTH AND HUMAN SERVICES, and | ) ) ) | |
| DEPARTMENT OF HEALTH AND HUMAN SERVICES, | ) ) ) | |
| Defendants. | ) ) | |

## STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE

Pursuant to Local Rule 7.1(h), Defendants Michael Leavitt, Secretary, Department Health and Human Services, and the Department of Health and Human Services, submit this statement of material facts as to which there is no genuine issue:

1.      Plaintiff sent a letter to the Acting Director of the Office of Head Start, Patricia Brown on February 28, 2008; in that letter, Plaintiff indicated that it had learned – through unspecified means – that Head Start planned to seek "the advice and recommendations of a group of private individuals concerning a massive revision of the Head Start performance standards." Compl., ¶ 17.  As such, Plaintiff contended that the meeting was subject to the Federal Advisory Committee Act ("FACA").  Id.

2.      In response, Director Brown sent a letter dated February 28, 2008, stating that the meeting about which Plaintiff had inquired was not subject to FACA "because the purpose of the

meeting is for individuals to voice their individual opinions rather than to consult with the group." Compl. at ¶ 18, Ex. B.

3.      Plaintiff sent a follow-up letter to Director Brown on March 4, 2008, in which it noted that Secretary Leavitt had recently announced the nomination of eight individuals to the Advisory Committee on Re-Designation of Head Start Grantees; Plaintiff asked if this Advisory Committee was the same was the group referenced in its February 28, 2008 letter. Id. at ¶ 20, Ex. D.

4.      Director Brown replied to Plaintiff by letter dated March 7, 2008, stating that the Advisory Committee was not the "same group that you referenced in your February 28, 2008 letter." Id. at ¶ 21, Ex. E. As noted by Director Brown, the Advisory Committee on Re-Designation of Head Start Grantees is subject to FACA. Id.

5.      Plaintiffs filed the instant lawsuit approximately a month later, on April 3, 2008. See Compl. at 1.

6.      The Head Start program promotes school readiness of low-income children by enhancing their cognitive, social and emotional development through the provision of educational, health, nutritional, social and other services to enrolled children and families. See Declaration of Patricia E. Brown, Acting Director, Office of Head Start, dated June 30, 2008, at ¶ 3 (attached hereto as Exhibit 1). Head Start programs engage parents in their children's learning and help them in making progress toward their educational, literacy and employment goals. Id.

7.      The Department of Health and Human Services administers the Head Start program by funding and exercising oversight stewardship of the approximately 1,600 local

-2-

community organizations that provide Head Start services to low-income children and families in their community.  Id. at ¶ 6.  All Head Start programs are responsible for serving a specified community or communities.  Id.  They must identify all eligible families in their community and, subject to the limitations of their annual funding grant, serve as many children and families as possible, giving priority to those most in need of a Head Start experience.  Id.  Currently, at least 90% of all enrolled children must be from families with incomes below the poverty line or families receiving public assistance (although the recent law reauthorizing Head Start requires regulations to be adopted that will, in certain circumstances, allow programs to serve up to 35% of their enrollment from families with incomes between 100%-130% of poverty.).  Id.

8.      Plaintiff's lawsuit relates to two meetings that were organized by the Office of Head Start within the Department of Health and Human Services ("OHS").  Id. at ¶ 9.  These meetings occurred in March 2008; the first meeting occurred on March 4-5, 2008, and the second meeting took place on March 25-26, 2008.  Id.  Both were held at the Hotel Palomar in Arlington, VA.  Id.  Attendees at the meetings included OHS staff and experts from various fields, including early childhood education, child health care, family services (including linguistically and culturally appropriate services to non-English speaking children and their families), administration, and financial management, and experience in the operation of Head Start programs.  Id.  Experts attending the March 25-26, 2008 meeting were also experienced in these areas and their applications to tribal areas.  Id.[1]

---

[1]  The meetings will be referred to herein as "the March 2008 performance standard meetings."

9.      The purpose of these meetings was for OHS staff to fulfill a statutory obligation to consult with subject-matter experts in these fields prior to proposing modifications to Head Start's performance standards for its agencies and grantees.  Id. at ¶ 10.  Congress provided for this consultation in a recently enacted statute, the Head Start for School Readiness Act of 2007, which was signed by the President on December 12, 2007.  Id.

10.     The obligation is set forth in 42 U.S.C. § 9836A(a)(2), which provides that,

> In developing any modifications to standards required under paragraph
>
>> (1), the Secretary shall-
>>
>>> consult with experts in the fields of child development, early childhood education, child health care, family services (including linguistically and culturally appropriate services to non-English speaking children and their families), administration, and financial management, and with persons with experience in the operation of Head Start programs . . .

11.     OHS organized the March 2008 meetings to fulfill its statutory obligation to consult with experts prior to proposing changes to its "program performance standards by regulation applicable to Head Start agencies and programs."  42 U.S.C. § 9836(A)(a)(1); see also Brown Decl., ¶¶ 10-12.   The last time these performance standards were revised was in 1993-94. Id. at ¶ 12.

12.     OHS invited a number of experts - approximately 50 - to attend the March 2008 performance standard meetings.  Id. at ¶ 13.  OHS officials informed the experts attending the meetings that they were there to "help inform the Federal staff of the 'state of the art' in areas

-4-

relevant to Head Start."  See id. at ¶ 14, Ex. A.  Some of the questions OHS staff wanted to discuss (id.) included:

What are the most significant advances in your field?

What do you consider to be the best practices in your field?

If you were developing or amending standards in your field, what would they look like?

Where has Head Start excelled in delivering services to children and families and where we could do better?

How can the current standards be improved to allow for more clarity, to improve collaboration, and to best support services to children and families?

13.     OHS selected the experts to invite through a process that involved researching and finding experts in the statutorily-mandated fields (early childhood education, child health care, family services (including linguistically and culturally appropriate services to non-English speaking children and their families), administration, and financial management, and with persons with experience in the operation of Head Start programs), and then contacting those experts to determine if they were available for, and interested in, the March 2008 performance standard meetings.  Id. at ¶ 15.

14.     For experts attending the March 2008 performance standard meetings, OHS agreed to pay for their travel costs (if they resided more than 50 miles outside of downtown Washington D.C.), their hotel stay, a per diem for meals, and an honorarium of $200 per day for participating in the conference.  Id. at ¶ 16.

15.     The attendees for the March 2008 performance standards meetings did not have an organized structure or fixed membership.  Id. at ¶ 17.  There was no attempt to achieve

consensus among those attending; the discussions were loose and unstructured.  Id.  They

convened only to offer their own opinions regarding their individual areas of expertise.  Id.

16.    The agendas for the meetings provided for both large group and small group

discussions.  See id. at ¶ 18, Exs. C-D.  During these discussions, the experts shared their

personal views on various issues, including (but not limited to) questions regarding appropriate

quality and outcome measures in areas of education, health services, nutrition and assessment;

the attendant costs to grantees of imposing rigorous standards; and whether standards should be

tied to what is customary and usual in state licensing, health and other requirements.  Id.  Other

than the agenda, which set forth the meeting schedule, the March 2008 performance standards

meetings had no structure or organization and represent the only occasion on which these two

groups of experts were ever convened.  Id. at ¶ 18.

17.    The experts were also attending the meeting in their personal capacities and were

not asked to convey the views of their various organizations.  Id. at ¶ 19.  The experts did not

take any positions as a group, and they did not provide any recommendations to OHS staff who

attended the meeting.  Id. at ¶ 20.

18.    OHS staff attending the March 2008 performance standard meetings listened to

what the experts had to say; no documents were generated as a result of the meeting (other than

notes).  Id. at ¶ 21.  As noted above, the input provided by the experts attending the March 2008

performance standards meetings was provided only on an individual basis.  Id. at ¶ 21.

19.    OHS has not followed-up or contacted these experts since the March 2008

performance standards meetings concluded.  Id. at ¶ 22.

20.     OHS is currently working on proposed modifications to performance standards for agencies and grantees.  Id. at ¶ 23.  These modifications will eventually be published as a notice of proposed rulemaking in the Federal Register.  Id.  Interested persons and organizations will be given the opportunity to comment on any proposed changes to the Head Start performance standards before any changes are finalized.  Id.

21.     The groups who attended the March 2008 performance standards meetings are not the same as the formal advisory committee on Re-Designation of Head Start Grantees convened by Secretary Leavitt and chartered on January 8, 2008.  Id. at ¶ 24, Ex. E.  That committee is a formal advisory committee and is subject to all the provisions of FACA.  Id.

Dated: July 1, 2008                             Respectfully submitted,

AMY WEISER                                      GREGORY G. KATSAS
Office of the General Counsel                   Acting Assistant Attorney General
Department of Health and
 Human Services                                 JEFFREY A. TAYLOR
                                                United States Attorney

                                                ELIZABETH J. SHAPIRO
                                                Assistant Branch Director
                                                Federal Programs Branch


                                                \s\ Diane Kelleher_____
                                                DIANE KELLEHER
                                                Senior Counsel
                                                United States Department of Justice
                                                Civil Division, Rm. 7318
                                                20 Massachusetts Ave, NW
                                                Washington, D.C.  20530
                                                Telephone:     (202) 514-4775
                                                Fax:           (202) 616-8470
                                                E-mail:        Diane.Kelleher@usdoj.gov

                                                Counsel for Defendants

-7-

# EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, | ) ) ) | |
| Plaintiff, | ) ) | CV-08-0576 (ESH) |
| vs. | ) ) ) | |
| MICHAEL LEAVITT, SECRETARY, DEPARTMENT OF HEALTH AND HUMAN SERVICES, and | ) ) ) | |
| DEPARTMENT OF HEALTH AND HUMAN SERVICES, | ) ) ) | |
| Defendants. | ) ) | |

## DECLARATION OF PATRICIA E. BROWN

I, PATRICIA E. BROWN, hereby declare as follows:

1.    I am Patricia Brown.  I make this declaration in support of the motion for summary judgment filed by the Defendants in the above-referenced suit.

2.    I currently serve as the Acting Director of the Office of Head Start in the Administration for Children and Families, Department of Health and Human Services.  I have served in this position since September 2007.

3.    As the Acting Director, I am responsible for the Office of Head Start ("OHS"), which promotes school readiness of low-income children by enhancing their cognitive, social and emotional development through the provision of educational, health, nutritional, social and other services to enrolled children and families.  Head Start programs engage parents in their children's learning and help them in making progress toward their educational, literacy and employment

goals. Many current and former Head Start parents are employed by local Head Start programs.

4.　　Prior to being appointed as the Acting Director of OHS, I served as the Regional Administrator for the Region VII Office of the Administration for Children and Families. I have over 33 years of experience in working with children and family well being issues at both the state and federal levels. I worked 18 years for the Missouri Department of Social Services as the Child Welfare Administrator in the Kansas City Office.

5.　　I began my career with ACF as a Child Welfare Specialist in 1993 and was later promoted to several positions including the Director of the Office of State and Tribal Programs (responsibility for Child Welfare, Child Care, TANF, Developmental Disabilities, Child Support Enforcement and Tribal programs), Director of the Office for Community Operations (OHS and Run Away Homeless Youth programs) and OHS Regional Program Manager after ACF's re-organization in October, 2006. I am a graduate of Louisiana State University.

6.　　The Department of Health and Human Services ("DHHS") administers the Head Start program by funding and exercising oversight stewardship of the approximately 1,600 local community organizations that provide Head Start services to low-income children and families in their community. All Head Start programs are responsible for serving a specified community or communities. They must identify all eligible families in their community and, subject to the limitations of their annual funding grant, serve as many children and families as possible, giving priority to those most in need of a Head Start experience.

Currently, at least 90% of all enrolled children must be from families with incomes below the poverty line or families receiving public assistance (although the recent law reauthorizing Head Start requires DHHS to develop regulations that will, in certain circumstances, allow programs to serve up to 35% of their enrollment from families with incomes between 100%-130% of poverty.)

7.      Head Start programs are located throughout the United States; providing OHS services at approximately 19,000 different locations. In FY 2007, approximately 900,000 children were served by Head Start with a budget of $6.9 billion.

8.      I make this declaration based on my personal knowledge or on information made known to me in the course of my official duties.

9.      The plaintiff's lawsuit relates to two meetings that were organized by OHS. These meetings occurred in March 2008. The first meeting occurred on March 4-5, 2008, and the second meeting took place on March 25-26, 2008. Both were held at the Hotel Palomar in Arlington, VA. Attendees at the meetings included OHS staff and experts from various fields. These fields included child health care, family services (including linguistically and culturally appropriate services to non-English speaking children and their families), administration, and financial management, and experience in the operation of Head Start programs. Experts attending the March 25-26, 2008 meeting were also experienced in these fields and their specific applications to tribal areas. For the case of reference, I will refer to both meetings as the March 2008 performance standard meetings.

10.     The purpose of the March 2008 performance standards meetings was for

OHS staff to fulfill a statutory obligation to consult with subject-matter experts in

these fields prior to proposing modifications to Head Start's performance

standards for its agencies and grantees.  Congress provided for this consultation in

a recently enacted statute, the Head Start for School Readiness Act of 2007,

which was signed by the President on December 12, 2007.

11.     The obligation is set forth in 42 U.S.C. § 9836A(a)(2), which provides

that,

> In developing any modifications to standards required under
> paragraph
>
>   (1), the Secretary shall—
>
>> consult with experts in the fields of child
>> development, early childhood education,
>> child health care, family services (including
>> linguistically and culturally appropriate
>> services to non-English speaking children
>> and their families), administration, and
>> financial management, and with persons
>> with experience in the operation of OHS
>> programs . . . .

12.     OHS organized the March 2008 meetings to fulfill its statutory obligation

to consult with experts prior to proposing changes to its "program performance

standards by regulation applicable to OHS agencies and programs."  42 U.S.C. §

9836(A)(a)(1).  The last time these performance standards were revised was in

1993-94.

13.     OHS invited a number of experts – approximately 50 – to attend the

March 2008 performance standard meetings.

14.       OHS officials informed the experts attending the meetings that they were

there to "help inform the Federal staff of the 'state of the art' in areas relevant to

Head Start." See February 29, 2008 Letter from Patricia E. Brown, Acting

Director, OHS (attached hereto as Exhibit A). Some of the questions OHS staff

wanted to discuss (id.) included:

> What are the most significant advances in your field?

> What do you consider to be the best practices in your
> field?

> If you were developing or amending standards in your
> field, what would they look like?

> Where has Head Start excelled in delivering services
> to children and families and where we could do
> better?

> How can the current standards be improved to allow
> for more clarity, to improve collaboration, and to best
> support services to children and families?

15.       OHS selected the experts to invite through a process that involved

researching and finding experts in the statutorily-mandated fields noted above,

and then contacting those experts to determine if they were available for, and

interested in, the March 2008 performance standard meetings.

16.       For experts attending the March 2008 performance standard meetings,

OHS agreed to pay for their travel costs (if they resided more than 50 miles

outside of downtown Washington D.C.), their hotel stay, a per diem for meals,

and an honorarium of $200 per day for participating in the conference. See

February 21, 2008 Letter from Patricia E. Brown (attached as Exhibit B).

17.     The attendees for the March 2008 performance standards meetings did not have an organized structure or fixed membership.  There was no attempt to achieve consensus among those attending; the discussions were loose and unstructured.  They convened only to offer their own opinions regarding their individual areas of expertise.

18.     The agenda for the meetings provided for both large group and small group discussions.  See Agenda for March 4-5, 2008 Meeting (attached as Exhibit C); Agenda for March 25-26, 2008 Meeting (attached as Exhibit D).  During these discussions, the experts shared their personal views on various issues, including (but not limited to) questions regarding appropriate quality and outcome measures in areas of education, health services, nutrition and assessment; the attendant costs to grantees of imposing rigorous standards; and whether standards should be tied to what is customary and usual in state licensing, health and other requirements.  Other than the agenda, which set forth the meeting schedule, the March 2008 performance standards meetings had no structure or organization and represent the only occasion on which these two groups of experts were ever convened.

19.     The experts attended the meetings in their personal capacities and were not asked to convey the views of their various organizations.

20.     The experts did not take any positions as a group, and they did not provide any recommendations to OHS staff who attended the meeting.

21.     OHS staff attending the March 2008 performance standard meetings listened to what the experts had to say; no documents were generated as a result of the meeting (other than notes).  The input provided by the experts attending the

March 2008 performance standards meetings was provided only on an individual basis.

22. OHS has not followed-up or contacted these experts since the March 2008 performance standards meetings concluded.

23. I understand plaintiffs are alleging that the March 2008 performance standards meetings were an effort to undertake a "massive revision of Head Start performance standards." Compl., Para. 17. The consultation with the experts was a pre-requisite set by Congress for the modification of performance standards for OHS grantees; OHS is currently working on proposed modifications to performance standards for agencies and grantees. These modifications will eventually be published as a notice of proposed rulemaking in the Federal Register. Interested persons and organizations will be given the opportunity to comment on any proposed changes to OHS performance standards before any changes are finalized.

24. I note that the groups who attended the March 2008 performance standards meetings are entirely separate from the formal advisory committee on the Re-Designation of Head Start Grantees convened by Secretary Leavitt and chartered on January 8, 2008. That committee is a formal advisory committee and is subject to all the provisions of FACA. See May 30, 2008 Letter to Scott Hodes (attached at Exhibit E).

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

is true and correct.


Dated:  6/30/08



PATRICIA E. BROWN

# EXHIBIT A



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

ADMINISTRATION FOR CHILDREN AND FAMILIES
Office of Head Start
1250 Maryland Avenue, SW
8th Floor
Washington, DC 20024

February 29, 2008

Dear Colleague:

We are looking forward to seeing you next week at the Expert Consultants meeting with the Office of Head Start. I want to provide you with some information on the meeting.

Federal staff are currently in the process of reviewing the *Head Start Program Performance Standards* in light of the Improving Head Start for School Readiness Act of 2007. This is also an opportunity to update and improve the standards as appropriate.

As part of this effort, 32 consultants with diverse expertise have been invited to Washington to help inform the Federal staff of the "state of the art" in areas relevant to Head Start. Some of the points we are hoping to hear from you about are:

- What are the most significant advances in your field?
- What do you consider to be best practices in your field?
- If you were developing or amending standards in your field, what would they look like?
- Where has Head Start excelled in delivering services to children and families and where could we do better?
- How can the current standards be improved to allow for more clarity, to improve collaboration, and to best support services to children and families?

Some of the Expert Consultants meeting will be large-group discussion of broad, cross-cutting issues. The meeting will also include small-group discussions. These will focus on issues related to health; oral health and nutrition; child development, early childhood education, children who speak languages other than English and their families, disabilities, mental health, assessment; family and community partnerships, and program design and management. The meeting will begin at 9:00 on both mornings and will adjourn at 4:30 on the 5th.

Attached for your information is a PDF of the Improving Head Start for School Readiness Act of 2007. Also attached is an Information Memorandum (with Attachment) prepared for Head Start grantees that provides an overview of some of the major requirements in the Act that have an impact on Head Start programs. These materials as well as the *Head Start Program Performance Standards* are also available through the Early Childhood Learning and Knowledge Center (ECLKC) at http://eclkc.ohs.acf.hhs.gov/hslc. If you are staying at the Hotel Palomar on Monday night, copies of the Act of 2007 and the *Head Start Program Performance Standards* will be available at the front desk as well as at the meeting on Tuesday morning.

Thank you again for your willingness to lend your knowledge and expertise to this effort to provide quality services to our nation's children and families. We look forward to seeing you on Tuesday!

Sincerely,

Patricia E. Brown
Acting Director
Office of Head Start

# EXHIBIT  B

February 21, 2008

Dear Colleague:

On behalf of the Office of Head Start, I want to thank you for agreeing to participate in the Expert Consultation on the Head Start Program Performance Standards. The meeting will be held on March 4-5, 2008 at the Hotel Palomar in Arlington, Virginia. The meeting begins at 9 a.m. on March 4 and adjourns at 5 p.m. on March 5.

Pal-Tech will cover the cost of your hotel and travel expenses if you live more than 50 miles outside of downtown Washington, D.C. If you are coming from out of town, we will make hotel reservations for you at the Hotel Palomar, 1121 N. 19th St., Arlington, VA. Upon arrival, you will need to give the hotel your credit card number (or other form of payment) for incidental expenses, as well as any additional nights you may wish to stay. The contact for your hotel is Tara Nordlander at Pal-Tech, tnordlander@pal-tech.com and telephone 703-247-8323.

Your travel arrangements should be made through Alta Travel. Please call 1-800-766-9930 and request to speak to Steve, identifying yourself as a participant in the Consultants Meeting. *Due to regulations for travel reimbursement, transportation purchased through other sources will not be reimbursed.* Ground transportation to and from the airport and meeting site will be reimbursed provided you submit receipt(s).

If you choose to drive to the meeting (in lieu of air or rail transportation), you will be reimbursed for actual mileage at the rate of $0.485 per mile, not to exceed the cost of round-trip coach airfare. Hotel parking is considered a ground transportation expense and will be reimbursed with receipt(s).

If your agency policies permit, you will also receive an honorarium in the amount of $200 per day for your participation in the conference. You will also receive a per diem to cover meals and incidentals during your stay. The honorarium and the per diem will be paid after the conference, once you have submitted your travel expense form.

In preparation for the meeting, we will be sending you additional information including an agenda. We appreciate your participation in the Consultants Meeting and look forward to seeing you soon.

Sincerely,

/s/

Patricia E. Brown
Acting Director
Office of Head Start

# EXHIBIT C





# Expert Consultation with the Office of Head Start
## March 4-5, 2008
### Hotel Palomar, Arlington, VA

**March 4**

| | |
|---|---|
| 9:00 a.m. | Welcome and Overview of Meeting |
| 9:15 a.m. | Overview of Reauthorization Changes |
| 10:00 a.m. | Overview of Current Program Performance Standards |
| 10:45 a.m. | Break |
| 11:00 a.m. | Large Group Discussion: Current State of Your Fields |
| 12:30 p.m. | Lunch (on your own) |
| 1:30 p.m. | Large Group Discussion: Current Standards |
| 2:30 – 5:00 p.m. | Small Group Discussions (take your break when you wish) |

- Health (child health, oral health, nutrition)
- Family and Community Partnerships
- Child Development (assessment, disabilities, early education, infants and toddlers)
- Program Design and Management

**March 5**

| | |
|---|---|
| 9:00 a.m. | Small Group Discussions continued: |

- Health (child health, oral health, nutrition)
- Family and Community Partnerships
- Child Development (assessment, disabilities, early education, infants and toddlers)
- Program Design and Management

| | |
|---|---|
| 12:00 p.m. | Lunch (on your own) |
| 1:00 p.m. | Large Group Discussion: Systems Issues and Service Intersections |
| 3:00 p.m. | Break |
| 3:15 p.m. | Large Group Discussion: Other Issues and Concerns Not Covered |
| 4:15 p.m. | Wrap Up |

# EXHIBIT D




# AIAN Tribal Consultation with the Office of Head Start
## March 25-26, 2008
### Hyatt Regency Washington, Washington, DC

## March 25

*Ticonderoga Room – Basement Level*

| | |
|---|---|
| 9:00 a.m. | Welcome and Overview of Meeting |
| 9:15 a.m. | Overview of Reauthorization Changes |
| 10:00 a.m. | Overview of Current Program Performance Standards |
| 10:45 a.m. | Break |
| 11:00 a.m. | Large Group Discussion: Current State of Your Fields |
| 12:30 p.m. | Lunch (on your own) |
| 1:30 p.m. | Large Group Discussion: Current Standards |

*Ticonderoga and Breakout Rooms 2nd Floor: Yellowstone, Grand Teton, Glacier, Bryce, Yosemite*

2:30 – 5:00 p.m.    Small Group Discussions
- Health
- Family and Community Partnerships
- Child Development (assessment, language preservation, disabilities, early education, infants and toddlers)
- Program Design and Management (administration, financial management)

## March 26

*Ticonderoga and Breakout Rooms 2nd Floor: Yellowstone, Grand Teton, Glacier, Bryce, Yosemite*

9:00 a.m.    Small Group Discussions continued:
- Health (child health, oral health, nutrition)
- Family and Community Partnerships
- Child Development (assessment, language preservation, disabilities, early education, infants and toddlers)
- Program Design and Management (administration, financial management)

12:00 p.m.    Lunch (on your own)

*Ticonderoga Room – Basement Level*

| | |
|---|---|
| 1:00 p.m. | Large Group Discussion: Systems Issues and Service Intersections |
| 3:00 p.m. | Break |
| 3:15 p.m. | Large Group Discussion: Other Issues and Concerns Not Covered |
| 4:15 p.m. | Wrap Up |

# EXHIBIT E

Case 1:08-cv-00776-ESH Document 67-3 Filed 07/00/12 2088 Page 2 56 of 27

ADMINISTRATION FOR CHILDREN AND FAMILIES
**Office of Head Start**
8th Floor Portal Building
1250 Maryland Avenue, SW
Washington, DC 20024

May 30, 2008

Mr. Scott A. Hodes
Attorney at Law
P.O. Box 42002
Washington, DC 20015

Dear Mr. Hodes:

Thank you for your interest on the Secretary's Advisory Committee on Re-Designation of
Head Start Grantees. Secretary Leavitt charted the Advisory Committee January 8, 2008.
The charter is available on the Federal Advisory Committee Database website at:
http://www.fido.gov/facadatabase/public.asp.

As you note the first Advisory Committee meeting was held March 12 -13, 2008 in
Washington, DC. In the enclosed Federal Register notice announcing the March meeting,
we provided an e-mail address (AdvisoryCommittee@pal-tech.com) to be used for all
requests for information and meeting materials. These materials were provided to 23
individuals and organizations through this mechanism (copy of meeting materials
enclosed). We have also posted the meeting summary on the FACA database website. If
you would like electronic copies of these materials please e-mail that request to the above
e-mail address.

The second Advisory Committee meeting will be taking place June 4-5[th] at the Four Points
by Sheraton at 1201 K Street, NW, Washington, DC. This meeting has also been
announced in the Federal Register. In addition, we alerted all individuals who attended the
first meeting and all those that had requested information of the meeting dates, time and
location. Through our targeted efforts we alerted 38 individuals and organizations, as well
as using the Federal Register process.

We hope to have information available shortly after the June meeting and will be happy to
send it to you directly. We will immediately send out the presentations, as we did in
March.

Page 2 – Mr. Scott A. Hodes

We are striving to keep the important work of this committee as transparent and open as possible and we take the statutory and regulatory requirements governing Federal Advisory Committees very seriously.

Sincerely,

Patricia Brown
Acting Director
Office of Head Start

Enclosures