## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                                       )
**CITIZENS FOR RESPONSIBILITY AND**    )
**ETHICS IN WASHINGTON,**                      )
                                                       )
          **Plaintiff,**                          )
                                                       )
**v.**                                                      )    **Civil Action No. 08-0576 (ESH)**
                                                       )
**MICHAEL LEAVITT, Secretary,**              )
**Department of Health and Human Services,**  )
***et al.*,**                                                 )
                                                       )
          **Defendants.**                        )
_____ )

## <u>MEMORANDUM OPINION</u>

Plaintiff Citizens for Responsibility and Ethics in Washington brings this action pursuant to the Federal Advisory Committee Act ("FACA"), 5 U.S.C. App. 2 §§ 1 *et seq.*, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, against the Department of Health and Human Services ("HHS") and its Secretary, Michael Leavitt.  Plaintiff alleges that two meetings organized by the agency in March 2008 with a group of private individuals regarding the Office of Head Start's ("OHS") performance standards were subject to FACA.  Based on this allegation, plaintiff seeks a declaratory judgment that defendants violated FACA, copies of all documents made available to or prepared for or by the group, and an injunction enjoining defendants from utilizing, consulting, or obtaining information or advice from the group until they comply with FACA.  This matter is before the Court on defendants' motion for summary judgment.  For the reasons set forth below, the Court will grant the motion.

## BACKGROUND

Plaintiff is a non-profit corporation "committed to protecting the right of citizens to be informed about the activities of government officials and to ensuring the integrity of government officials through transparency in government processes." (Compl. ¶ 4.)  Defendant HHS administers the Head Start program by funding and exercising oversight of approximately 1,600 local community organizations that provide Head Start services to low-income children and families in their community.  (Declaration of Patricia E. Brown, Acting Director of the Office of Head Start ["Brown Decl."] ¶ 6 (attached to Defs.' Statement of Material Facts).)  The Head Start program promotes school readiness of low-income children by enhancing their cognitive, social, and emotional development through the provision of educational, health, nutritional, social and other services to enrolled children and families.  (*Id.* ¶ 3.)

This action involves two meetings that were organized by OHS within HHS.  The meetings were held on March 4-5, 2008 and March 25-26, 2008, at the Hotel Palomar in Arlington, Virginia, and included OHS staff and experts in various fields pertinent to the Head Start program.[1]  (*Id.* ¶ 9.)  The purpose of the meetings was to permit OHS staff to fulfill a statutory mandate to consult with experts in relevant fields prior to proposing changes to Head Start's performance standards for its agencies and grantees.  (*Id.* ¶ 10.)  The Improving Head Start for School Readiness Act of 2007 directed HHS to modify, as necessary, Head Start program performance standards.  *See* 42 U.S.C. § 9836a(a)(1).  In light of the Act, OHS commenced work on proposed modifications to performance standards, which will ultimately be subject to notice and comment rulemaking procedures.  (*Id.* ¶ 23.)  In developing these

---

[1] Some, if not all, the experts were apparently employees of organizations that address issues of relevance to Head Start.  However, according to OHS, the experts attended the meetings in their personal capacities and were not asked to convey the views of their various organizations.  (*See* Brown Decl. ¶ 19.)

modifications, however, the Act required HHS to first "consult with experts in the fields of child

development, early childhood education, child health care, family services (including

linguistically and culturally appropriate services to non-English speaking children and their

families), administration, and financial management, and with persons with experience in the

operation of Head Start programs . . . ."  42 U.S.C. § 9836a(a)(2)(A).  The experts who attended

the March 2008 performance standards meetings were experienced in the fields identified in the

statute, with those attending the latter meeting having experience in these fields and their specific

applications to tribal areas.  (Brown Decl. ¶ 9.)

OHS invited approximately 50 experts to attend the meetings in order to "help inform the

Federal staff of the 'state of the art' in areas relevant to Head Start."  (*Id.* ¶¶ 13-14, Ex. A.)

Conference attendees were informed that the agency was interested in hearing their answers to

such questions as:

> What are the most significant advances in your field?
>
> What do you consider to be best practices in your field?
>
> If you were developing or amending standards in your field, what would they look like?
>
> Where has Head Start excelled in delivering services to children and families and where could we do better?
>
> How can the current standards be improved to allow for more clarity, to improve collaboration, and to best support services to children and families?

(*Id.* ¶ 14, Ex. A.)  OHS agreed to pay the travel costs of attendees who resided more than 50

miles outside of downtown Washington, D.C., as well as hotel charges, a per diem for meals, and

a $200 per day honorarium to all attendees.  (*Id.* ¶ 16, Ex. B.)

According to the meeting agendas, which were essentially identical, each meeting lasted

for two full days and consisted of a brief welcome and overview of the meeting, overview of

Head Start reauthorization changes and current program performance standards, and large and small group discussions.  (*See id.* Exs. C, D.)  During the group discussions, the expert attendees shared their personal views on questions regarding issues applicable to Head Start, including the appropriate quality and outcome measures in the areas of education, health services, nutrition, and assessment; the attendant costs to Head Start grantees of imposing rigorous standards; and whether standards should be tied to what is customary and usual in state licensing, health, and other requirements.  (*Id.* ¶ 18, Exs. C, D.)  The meeting agenda provided the only structure or organization to the meetings.  (*Id.* ¶ 18.)  Moreover, the meetings constitute the only occasion on which these two groups of experts were ever convened.  (*Id.*)  No reports or other documents were generated as a result of the meetings other than participants' notes.  (*Id.* ¶ 21.)

On February 28, 2008, plaintiff sent a letter to Patricia Brown, Acting Director of OHS, stating that it had been advised that OHS planned to "hold a meeting next week at which it will seek the advice and recommendations of a group of private individuals concerning a massive revision of the Head Start performance standards."  (Compl. ¶ 17, Ex. A.)  Plaintiff contended that the group was an advisory committee under FACA and, as such, sought information about the meeting and a copy of the charter for the group as required by FACA.  (*Id.*)  In response, Brown sent a letter in which she claimed that the meeting was not covered by FACA "because the purpose of the meeting is for individuals to voice their individual opinions rather than to consult with the group."[2]  (*Id.* ¶ 18, Ex. B.)

---

[2] Plaintiff also inquired about the group's relationship to the Advisory Committee on Re-Designation of Head Start Grantees, a FACA committee chartered by Secretary Leavitt that met for the first time on March 12, 2008.  (*See* Compl. ¶¶ 19-20, Exs. C, D.)  However, the groups involved in the March 2008 performance standards meetings at issue here are not the same as that advisory committee.  (*See id.* ¶ 21, Ex. E; Brown Decl. ¶ 24, Ex. E.)

# ANALYSIS

## I.    STANDARD OF REVIEW

A party is entitled to summary judgment if the pleadings on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  Material facts are those that "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Once the movant has met its burden, the burden then shifts to the non-moving party to demonstrate that there is a genuine issue in dispute.  *Anderson*, 477 U.S. at 250.  In considering whether there is a triable issue of fact, the Court must draw all reasonable inferences in favor of the non-moving party.  *Anderson*, 477 U.S. at 255.  The party opposing a motion for summary judgment, however, "may not rely merely on allegations or denials in its own pleading; rather, its response must . . . set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).  The non-moving party must do more than simply "show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).  Moreover, "any factual assertions in the movant's affidavits will be accepted as being true unless [the opposing party] submits his own affidavits or other documentary evidence contradicting the assertion."  *Neal v. Kelly,* 963 F.2d 453, 456 (D.C. Cir.1992) (quoting *Lewis v. Faulkner*, 689 F.2d 100, 102 (7th Cir. 1982)).

## II.      DISCUSSION

### A.      The March 2008 Performance Standards Meetings Were Not Subject to FACA Because Attendees Did Not Render Advice as a Group

The sole issue before the Court is whether the attendees of OHS's performance standards meetings constitute an advisory committee within the meaning of FACA. "The Congress enacted the FACA in order 'to control the establishment of advisory committees to the federal government and to allow the public to monitor their existence, activities, and cost.'" *Ctr. for Arms Control & Non-Proliferation v. Pray*, 531 F.3d 836, 839 (D.C. Cir. 2008) (quoting *Animal Legal Defense Fund v. Shalala*, 104 F.3d 424, 426 (D.C. Cir. 1997)).  To accomplish these objectives, FACA imposes a number of procedural and disclosure requirements on those bodies that are deemed to be advisory committees.[3]  With certain exceptions not relevant here, FACA defines an "advisory committee" as

> any committee, board, commission, council, conference, panel, task force, or
> other similar group, or any subcommittee or other subgroup thereof . . . which is -
>
> (A)      established by statute or reorganization plan, or
> (B)      established or utilized by the President, or
> (C)      established or utilized by one or more agencies,
>
> in the interest of obtaining advice or recommendations for the President or one or
> more agencies or officers of the Federal Government . . . .

---

[3] For example, an advisory committee must file a detailed charter setting forth its objectives and the scope of its activities, hold all meetings open to the public, give advance notice in the Federal Register of any meetings, permit members of the public to attend meetings, keep detailed minutes of each meeting, make available for public inspection the records and other documents made available to or prepared for by the committee provided they do not fall within any Freedom of Information Act exemption, and make available transcripts of its meetings.  *See* 5 U.S.C. App. 2 §§ 9(c), 10, 11(a).  Such committees must also be fairly balanced in terms of points of view represented and exercise independent judgment not inappropriately influenced by the appointing authority or any special interest.  *Id.* § 5(b)(2), (3), 5(c).

5 U.S.C. App. 2 § 3(2).  While recognizing the "almost unfettered breadth" of this definition, the

Supreme Court has nevertheless admonished that

> FACA was enacted to cure specific ills, above all the wasteful expenditure of
> public funds for worthless committee meetings and biased proposals; although its
> reach is extensive, we cannot believe that it was intended to cover every formal or
> informal consultation between the President or an Executive agency and a group
> rendering advice.

*Public Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 453 & n.8 (1989).

The D.C. Circuit has provided guideposts for determining whether a group constitutes a

FACA committee.  Specifically, the Court has held that an important factor in determining the

existence of a FACA committee is the formality and structure of the group.  *Ass'n of Am.*

*Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d 898, 914 (D.C. Cir. 1993).  Thus, in order to

implicate FACA, the executive agency must "create an advisory group that has, in large measure,

an organized structure, a fixed membership, and a specific purpose."  *Id.*  Moreover, the Court

has explained that:

> When we examine a particular group or committee to determine whether
> FACA applies, we must bear in mind that a range of variations exist in terms of
> the purpose, structure, and personnel of the group.  Perhaps it is best characterized
> as a continuum.  At one end one can visualize a formal group of a limited number
> of private citizens who are brought together to give publicized advice as a group.
> That model would seem covered by the statute . . . .  At the other end of the
> continuum is an unstructured arrangement in which the government seeks advice
> from what is only a collection of individuals who do not significantly interact
> with each other.  That model, we think, does not trigger FACA.

*Id.* at 915.

In this case, the attendees of the OHS performance standards meetings fall closer to the

latter end of this continuum.  OHS organized two meetings of experts in fields relevant to Head

Start.  The experts met with OHS staff to answer questions regarding advances and best practices

in their fields and their ideas for improving standards in their fields and the Head Start program

and to otherwise "help inform [OHS] staff of the 'state of the art' in areas relevant to Head

Start." (Brown Decl. ¶ 14, Ex. A.) The groups had no formal organizational structure, there

were only two meetings, and it is not clear that there was any overlap in membership of the

groups that attended the March 4-5 and March 25-26 meetings. (*Id.* ¶¶ 18, 22.) Attendees

conveyed their own opinions regarding their individual areas of expertise. (*See id.* ¶¶ 17-21.)

No group report or other collaborative work product was created. (*See id.* ¶ 21.) Thus, the

performance standards meetings constitute the "type of ad hoc, unstructured meeting[s]

specifically exempted from FACA's ambit." *Grigsby Brandford & Co. v. United States*, 869 F.

Supp. 984, 1002 (D.D.C. 1994) (finding no advisory committee where meeting had no structure

or organization and represented the only occasion on which the group was convened); *see also*

*Ass'n of Am. Physicians & Surgeons*, 997 F.2d at 913 ("[A] group is a FACA advisory

committee when it is asked to render advice or recommendations, as a group, and not as a

collection of individuals. The group's activities are expected to, and appear to, benefit from the

interaction among the members both internally and externally.").

Courts have held that other groups of experts established by the executive branch fall

outside the ambit of FACA. For example, in *American Society of Dermatology v. Shalala*, 962

F. Supp. 141 (D.D.C. 1996), the court found that multispecialty physician panels established by

the Health Care Financing Administration to help it evaluate public comments regarding the

physicians' fee schedule for Medicare reimbursement did not function as a group and therefore

were not subject to FACA. The court based its decision on the following factors: the panels had

no fixed membership; panelists changed annually; each panel was convened only once; after the

group heard arguments and discussed the issues, each panelist gave his or her individual work

value ratings for the various medical procedures at issue; individual panelists' ratings remained

confidential; and no attempt was made to achieve a consensus among the panelists.  962 F. Supp.
at 148.  Similarly, in this case, membership in the expert groups was not fixed, there were only
two group meetings, and experts conveyed their opinions regarding their individual areas of
expertise with no attempt to achieve consensus.[4]  *Cf. Heartwood*, 431 F. Supp. 2d at 35 (team of
scientists established by United States Forest Service and "assembled for the single purpose of
drafting the ecological assessment to inform the [Forest Service's] policy-making" constituted a
FACA committee).

Plaintiff's reliance on *Northwest Forest Resource Council v. Espy*, 846 F. Supp. 1009
(D.D.C. 1994), is unavailing.  In that case, the court found that the Forest Ecosystem
Management Assessment Team, a group established and utilized by the President to provide
guidance in devising a federal forest management policy, was a FACA committee.  There was no
suggestion, however, that the members of the Team, which produced a more than 1,000 page
report identifying various forest management alternatives on which the government relied in
establishing and implementing its Forest Plan, did not render advice or recommendations as a
group.  Thus, if anything, that case supports defendants' position as to the two OHS meetings at
issue here.

---

[4] Plaintiff attempts to distinguish *American Society of Dermatology* by claiming that a "key
factor" in the court's decision was the confidentiality of the individual panelists' ratings and by
noting that the experts in that case were rating technical surgical procedures rather than assisting
in the development of performance standards.  (Opp'n at 11.)  However, the confidentiality of
the panelists' ratings was just one of several factors that the court considered relevant to the issue
of whether the panelists functioned as a group.  While there is no indication in the present case
that meeting attendees' statements were confidential, there were other indicia of lack of group
action such as the lack of any ratings, report, or other collaborative output.  Moreover, the fact
that the experts in *American Society of Dermatology* were rating technical surgical procedures
was not deemed relevant by the court, which focused exclusively on whether the expert panels
functioned as a group.  *Cf. Heartwood, Inc. v. U.S. Forest Serv.*, 431 F. Supp. 2d 28, 34 (D.D.C.
2006) ("Advisory panels that support decision makers with data, and not policy advice or
recommendations, can be considered advisory committees under the FACA.").

Accordingly, as there is no genuine issue regarding whether the attendees of the March performance standards meetings rendered advice or recommendations as a group, summary judgment is appropriate.

### B.      Plaintiff is Not Entitled to Discovery

Alternatively, plaintiff requests discovery pursuant to Federal Rule of Civil Procedure 56(f).  Under the rule, a court may deny a motion for summary judgment or order a continuance if the party opposing the motion "shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition."  Plaintiff claims that it needs "discovery on who the experts in attendance [at the March performance standards meetings] were, how they were selected for their attendance, their organizational attachments, specific details of the workings of the March 2008 meetings, including the nature of the contributions each expert made and how they functioned as a group, and the process by which the OHS used or is using the data culled from the meetings to recommend updates to Head Start performance standards."  (Opp'n at 14; Plaintiff's Rule 56(f) Declaration ¶ 6 (attached to Opp'n).)

While summary judgment ordinarily "is proper only after the plaintiff has been given adequate time for discovery," *First Chicago Int'l v. United Exch. Co.*, 836 F.2d 1375, 1380 (D.C. Cir. 1988), the information plaintiff seeks through discovery is simply not necessary to decide this case.  The sole question at issue here is whether OHS solicited the collective advice of expert attendees of the March performance standards meetings.  *See Ass'n of Am. Physicians & Surgeons*, 997 F.2d at 913.  The identities of the meeting attendees and their organizational attachments, their method of selection, the specific advice they provided, and how OHS used or will use this advice is irrelevant to this question.  Thus discovery is not likely to reveal any triable issue of fact.  *See Carpenter v. Fed.  Nat'l Mortgage Ass'n*, 174 F.3d 231, 237 (D.C. Cir.

1999) (party seeking pre-summary judgment discovery must identify facts to be discovered that would create a triable issue).

To support its argument that "discovery is the norm in FACA cases," plaintiff has cited only one case - - *Ass'n of Am. Physicians & Surgeons*, 997 F.2d at 915.  (Opp'n at 13.)  But that case does little to help plaintiff, since the Court lacked evidence regarding the functioning of the working group at issue.  *See* 997 F.2d at 915 ("We simply have insufficient material in the record to determine the character of the working group and its members.")  Therefore, the situation here is not analogous given the declaration provided by Brown.

Moreover, plaintiff's criticisms of Brown's declaration as "provid[ing] no specific details" and being "completely conclusory" are without merit.  (Opp'n at 13 & n.3.)  While Brown does not disclose all the facts regarding the performance standards meetings, she does disclose enough facts to establish that the experts who attended the meetings were not asked to render collective advice.  This is sufficient.  To require that defendants disclose the details of the meetings in response to plaintiff's requests for discovery would effectively provide plaintiff with the very relief it seeks on the merits.  Where, as here, plaintiff offers no reason to doubt Brown's veracity, discovery under Rule 56(f) may not be used to test her credibility.[5]  *Strang v. U.S. Arms Control & Disarmament Agency*, 864 F.2d 859, 861 (D.C. Cir. 1989) (Without some reason to question the veracity of affiants plaintiff's "desire to 'test and elaborate' affiants' testimony" does not justify Rule 56(f) discovery.)

---

[5] Brown is the acting director of OHS and the author of the letters that were sent to meeting attendees.  Moreover, she avers that her declaration is based on her personal knowledge or information made known to her in the course of her official duties.  (Brown Decl. ¶ 8.)  Thus, there can be no suggestion that Brown was not the appropriate party to provide the relevant information.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment will be granted.  A

separate order accompanies this Memorandum Opinion.


/s/
_____
ELLEN SEGAL HUVELLE
United States District Judge

Date: September 22, 2008